

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-9-2009

# Huston v. Procter Gamble

Precedential or Non-Precedential: Precedential

Docket No. 07-2799

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

Recommended Citation

"Huston v. Procter Gamble" (2009). *2009 Decisions.* Paper 1104.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/1104

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 07-2799
_____

PRISCILLA HUSTON,
Appellant

v.

THE PROCTER & GAMBLE PAPER PRODUCTS
CORPORATION

_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
District Court  No. 05-cv-02389
District Judge: The Honorable James F. McClure

_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
June 30, 2008

Before: RENDELL, SMITH, and FISHER, *Circuit Judges*

(Filed: June 8, 2009)

1

Lori K. Serratelli, Esq.
Serratelli, Schiffman, Brown & Calhoon, P.C.
2080 Linglestown Road Ste 2001
Harrisburg, PA 17110
        *Counsel for Appellant*

John J. Myers, Esq.
Ryan J. Siciliano, Esq.
Eckert Seamans Cherin & Mellott, LLC
600 Grant Street 44th Floor
Pittsburgh, PA 15219
        *Counsel for Appellee*

---

OPINION

---

SMITH, *Circuit Judge.*

This is a Title VII suit for sexual harassment and retaliation. Priscilla Huston appeals from a grant of summary judgment in favor of her former employer, Procter & Gamble Paper Products Corporation (P&G). Huston's appeal hinges on whether two P&G employees qualify as "management level" so that their knowledge may be imputed to P&G for purposes of liability under Title VII. The United States District Court for the Middle District of Pennsylvania determined that the two employees were not management level and that P&G took prompt and adequate remedial measures as soon as it had notice

2

of Huston's harassment allegations. We will affirm the District Court's judgment, and in so doing, clarify the definition of "management level." We will also affirm the District Court's judgment that Huston cannot make out a retaliation claim.

## I.

The events underlying Huston's lawsuit allegedly occurred in the spring of 2004, by which time Huston had been employed at P&G's Mehoopany plant for more than a decade. Huston worked as a technician on the teams that operated large paper manufacturing machines. The teams worked shifts monitoring the machines and their gauges and instruments to make sure that they ran smoothly and safely to manufacture paper products.

The first incident Huston relies on to support her Title VII claim allegedly occurred on May 13, 2004. Although she did not witness this incident, Huston alleges that she heard that one of her male teammates had exposed himself in the plant control room in the presence of three other male teammates.[1] According to Huston, someone informed supervising technicians Pete Romanchick and Jack Traver of this incident the next day. Huston indicates that a similar incident occurred on May 22,

---

[1] Specifically, Huston alleges that one of her male teammates "put his testicles on the testing table to cool them off." Appellant's Br. 5–6.

2004. Once again, she was not a witness and contends only that she heard that another male teammate had similarly exposed himself in front of four male teammates.

Huston also alleges that, on June 7, 2004, she was in the control room with her teammates when one of them exposed himself while explaining that he had shaved his testicles. She further alleges that the same man exposed himself again the next day in front of her and three male P&G employees.

Huston reported these incidents to senior-level manager Regina Gray and human resources manager Linda Sheehan on June 30, 2004. At the same time, she complained that her male teammates looked at pornography using the control room computer and that they kept pornographic magazines on the work site as well. P&G launched an investigation into Huston's allegations on the same day—June 30, 2004. Francisco Lanza, the manager of Huston's team, assisted Gray and Sheehan with the investigation. They interviewed various individuals named by Huston in her allegations. Each interviewed employee denied either exposing himself or witnessing another teammate expose himself. One teammate did admit making sexually explicit comments to two female temporary employees in the control room, and another teammate admitted sending male co-workers an e-mail containing images of topless women.

At the conclusion of its investigation, in July 2004, P&G sanctioned everyone on Huston's team—including

4

Huston—within the framework of its five-step disciplinary program. Under this program, an employee in breach of P&G policies is disciplined by being placed on a step with attendant sanctions and notice. An employee who is already on one of the steps can be advanced to a higher step if P&G decides that a more stringent warning is called for. The fifth step in the program is termination.

Each of Huston's teammates was placed on, or advanced, a disciplinary step for various transgressions discovered through the investigation into Huston's allegations. Huston herself was disciplined along with her teammates because P&G determined that the entire team used vulgar language at work—a practice P&G sought to eliminate. Huston was already on step four due to prior transgressions, including a "life-threatening" safety violation from 2003. She was not advanced to step five, however; instead, her file was simply annotated to record that she was asked to be mindful of her language at work.

In the fall of 2004, P&G identified a costly problem with production quality at the Mehoopany plant. Management traced this problem to a lack of care on the part of technicians monitoring and maintaining the machines. As a result, the plant's management convened a meeting for all technicians working on the machines. The purpose of the meeting was to reiterate that the technicians were to be diligent and thorough in monitoring gauges and recording machine data to ensure that the manufacturing processes ran properly. To drive the point home,

5

management warned technicians, including Huston, that they risked termination if they were caught fabricating data for the machine data logs.

Notwithstanding this warning from management, Huston falsified machine log data on October 21, 2004. When confronted by Romanchick about her log entries, she admitted to the falsified data. P&G terminated her employment.

On November 17, 2005, Huston filed a complaint against P&G in the United States District Court for the Middle District of Pennsylvania asserting claims for sex discrimination and retaliation under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. §§ 2000e-2(a)(1), 2000e-3(a), and under the Pennsylvania Human Relations Act (PHRA), 43 Pa. Cons. Stat. § 955. The District Court granted summary judgment against Huston on May 24, 2007. Huston now appeals from that judgment.

II.

The District Court exercised jurisdiction under 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5(f)(3). We have jurisdiction under 28 U.S.C. § 1291 and our review is plenary. *Knabe v. Boury Corp.*, 114 F.3d 407, 410 n.4 (3d Cir. 1997). Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant

is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). We draw all reasonable inferences from the record in favor of Huston, the non-moving party. *Knabe*, 114 F.3d at 410 n.4. "Where the record taken as a whole could not lead a reasonable trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

## III.

Under Title VII, an employer may not "discharge . . . or . . . discriminate against any individual with respect to . . . compensation, terms, conditions, or privileges of employment because of such individual's . . . sex [.]" 42 U.S.C. § 2000e-2(a)(1).[2] A plaintiff may further establish that an employer violated Title VII by proving that sexual harassment created a hostile work environment. *Kunin v. Sears Roebuck & Co.*, 175 F.3d 289, 293 (3d Cir. 1999) (citing *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 66 (1986)). To establish a hostile work environment claim against an employer, a plaintiff must prove the following:

---

[2] "The proper analysis under Title VII and the Pennsylvania Human Relations Act is identical, as Pennsylvania courts have construed the protections of the two acts interchangeably." *Weston v. Pennsylvania*, 251 F.3d 420, 426 n.3 (3d Cir. 2001) (citations omitted).

> (1) the employee suffered intentional discrimination because of their sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of *respondeat superior* liability.

*Weston v. Pennsylvania*, 251 F.3d 420, 426 (3d Cir. 2001) (citing *Andrews v. City of Phila.*, 895 F.2d 1469, 1482 (3d Cir. 1990)). The first four elements of this claim establish that a hostile work environment existed. The fifth element, which is the only element at issue in this appeal, establishes the basis on which to hold the employer liable. The basis of an employer's liability for hostile environment sexual harassment depends on whether the harasser is the victim's supervisor or merely a co-worker. *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1998) (citations omitted). In the present case, Huston concedes that the employees who performed or witnessed the alleged harassing incidents were not supervisors; all were merely co-worker technicians. When the hostile work environment is created by a victim's non-supervisory co-workers, the employer is not automatically liable. *Kunin*, 175 F.3d at 293. Rather, employer liability for co-worker harassment exists only if the employer failed to provide a reasonable avenue for complaint or, alternatively, if the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action. *See Weston*, 251 F.3d at 427 (citing

*Kunin*, 175 F.3d at 293).[3] That is, an employer may be directly liable for non-supervisory co-worker sexual harassment only if the employer was negligent in failing to discover the co-worker harassment or in responding to a report of such harassment. Huston does not argue that P&G failed to provide a reasonable avenue for complaint. Instead, she contends that P&G knew or should have known of harassment through the technicians Romanchick and Traver, as of May 14, 2004, and that P&G failed to take prompt and appropriate remedial action.

We have explained that an employer knew or should have known about workplace sexual harassment if "*management-level* employees had actual or constructive knowledge about the existence of a sexually hostile environment[.]" *Andrews*, 895 F.2d at 1486 (citing *Katz v. Dole*, 709 F.2d 251, 255 (4th Cir. 1983)) (emphasis added). We have also recognized that management level employees have constructive notice of a hostile work environment when "an employee provides management level personnel with enough information to raise a probability of sexual harassment in the mind of a reasonable

---

[3] As we have noted previously, an employer is directly, not vicariously, liable for its negligent response to knowledge of sexual harassment by co-workers and the term "*respondeat superior*" may thus not be accurate; rather, in this context, "'respondeat superior' . . . connotes notice to the employer[.]" *Kunin*, 175 F.3d at 293 n.5.

employer[.]" *Kunin*, 175 F.3d at 294.[4]

Huston argues that Romanchick and Traver were management level employees because they held the supervisory positions of process coach and machine leader, respectively, and they had the authority to "turn in" employees who were in breach of plant policies. In particular, Huston suggests that Romanchick qualifies as management level because he facilitated the termination of her employment by reporting on Huston's data falsification to her manager, Francisco Lanza. P&G counters that Romanchick and Traver were merely technicians, like Huston, and that their duties were limited to ensuring that the production line machines ran smoothly. While charging that Romanchick facilitated the termination of her employment, Huston does not dispute that neither Romanchick nor Traver had the authority to discipline technicians on behalf of P&G or otherwise change their employment status.

In deciding whether Romanchick and Traver qualified as management level employees, the District Court observed that the Third Circuit "ha[s] given little guidance as to what

---

[4] An employer may also have constructive notice of harassment if the harassment is "so pervasive and open that a reasonable employer would have had to be aware of it," *Kunin*, 175 F.3d at 294 (citing *Zimmerman v. Cook County Sheriff's Dep't*, 96 F.3d 1017, 1018–19 (7th Cir. 1996)). Huston makes no such allegation in this case.

10

["management level"] exactly means in the context of imputing constructive notice of co-worker sexual harassment to the employer." *Huston v. Proctor & Gamble Paper Prods. Co.*, No. 05-cv-2389, 2007 WL 1521235, at *5 (M.D. Pa. May 24, 2007). Our decision in *Kunin* did not turn on the status of the employee alleged to have notice of the harassment but rather on the inadequacy of that notice. *Kunin*, 175 F.3d at 295 ("[T]here is simply no evidence that [the supervisor] had knowledge that the rude language was gender specific."). Similarly, in *Andrews*, a case which involved the pervasive use of derogatory and insulting sexist terms directed at women in a division of the Philadelphia police department, the meaning of "management level" was not at issue and was not developed. *Andrews*, 895 F.2d at 1487. Huston's appeal thus provides us with the opportunity to offer some guidance to the district courts as to who qualifies as a "management level" employee.

In this endeavor, "[w]e turn to principles of agency law, for the term 'employer' is defined under Title VII to include 'agents.' 42 U.S.C. § 2000e(b). . . . In express terms, Congress has directed federal courts to interpret Title VII based on agency principles." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 754 (1998) (referring to agency principles in deciding that an employer is vicariously liable for a supervisor's sexual harassment when the supervisor takes a tangible employment action against the subordinate) (internal citation omitted). The relevant agency principles here are those governing when to impute an agent's knowledge of particular facts to the agent's

11

principal. On this score, the Restatement (Third) of Agency explains:

> For purposes of determining a principal's legal relations with a third party, notice of a fact that an agent knows or has reason to know is imputed to the principal *if knowledge of the fact is material to the agent's duties to the principal*, unless the agent (a) acts adversely to the principal as stated in § 5.04, or (b) is subject to a duty to another not to disclose the fact to the principal.

Restatement (Third) of Agency § 5.03 (2006) (emphasis added). According to this rule, not all facts known by an agent are imputed to the principal. Rather, there are two parameters limiting when knowledge of facts known by an agent is imputed to the principal: the agent's *duties* to the principal; and the materiality—or significance—of the facts in question to those duties.

*First*, "[t]he scope of an agent's duties delimits the content of knowledge that is imputed to the principal." *Id.* § 5.03 cmt. b. The Restatement (Third) of Agency illustrates this point with the following example:

> P Corporation manufactures construction supplies, using numerous chemicals in its

12

manufacturing processes. Governmental regulations applicable to P Corporation require that it dispose of chemicals used in manufacturing in a manner that does not degrade the natural environment and that it promptly investigate and rectify environmentally damaging spills of chemicals. P Corporation employs A, an environmental engineer, whose duties include monitoring P Corporation's facilities for compliance with applicable environmental regulations and reporting the results of A's findings to S, a superior agent within P Corporation. While touring the exterior of P Corporation's plant, A inspects a pipe that drains used chemicals into storage vats. A observes that a chemical is leaking from a pipe into the ground in close proximity to a stream. Notice of the fact that the pipe leaks, known to A, is imputed to P Corporation. . . . [But under a different scenario where] the leaky pipe is observed by B, a clerk in P Corporation's accounts-payable department[, and where] B's duties do not include monitoring P Corporation's compliance with environmental regulations[,] [n]otice of the fact that the pipe leaks, known to B, is *not* imputed to P Corporation.

*Id.* § 5.03 cmt. b, illus. 5 & 7 (emphasis added). In this example, B's knowledge of the pipe leak is not imputed to P Corporation because that knowledge is beyond the scope of B's duties. P

13

Corporation does not employ B to monitor compliance with environmental laws but rather to work as an accounting clerk. In contrast, A's knowledge of the leak is imputed to P Corporation because P Corporation employs A specifically to monitor and report on its compliance with environmental laws. A's knowledge of the chemical leak thus lies squarely within the scope of A's employment duties. *Id.* § 5.03 cmt. e ("The breadth of notice imputed to a principal of facts that an agent knows or has reason to know mirrors the agent's duty to the principal . . . .").

The Restatement (Third) of Agency notes further that the scope of an agent's duties is especially relevant in the context of an organization that may employ many different individuals to perform different tasks. *Id.* § 5.03 cmt. c. ("The nature and scope of the duties assigned to an agent are key to imputation within an organization."). Under this approach, a corporation is not charged with the legal consequences of an employee's knowledge of a fact that lies outside the scope of the employee's duties to the corporation. *Id.*

*Second*, even if knowledge lies within the scope of an employee's duties, that knowledge is not necessarily imputed to the employer. Rather, to justify imputation, the knowledge must also be material—i.e., important or significant—to the employee's duties to the employer. *See* Restatement (Second) of Agency § 272 cmt. a ("The principal is affected by the agent's knowledge whenever the knowledge is *of importance* in the act

14

which the agent is authorized to perform.") (emphasis added); *see also Oxford English Dictionary* (2d ed. 1989) (defining "material" as "of serious or substantial import; of much consequence; important"); *Black's Law Dictionary* 998 (8th ed. 2004) (defining "material" as "of such a nature that knowledge of the item would affect a person's decision-making; significant; essential"). Thus, to justify imputing an employee's knowledge of facts to an employer, the facts must be important or significant to the employee's *duties* to the employer. This is the case when the employee uses that knowledge in the performance of the employee's duties to the employer. In other words, the employee's knowledge of facts may be imputed to the employer only if that knowledge is important to the function the employee is employed to perform.

Under this approach, an employee's knowledge of sexual harassment may be imputed to the employer when the employee is employed to report or respond to sexual harassment. We thus conclude that an employee's knowledge of allegations of co-worker sexual harassment may typically be imputed to the employer in two circumstances: first, where the employee is sufficiently senior in the employer's governing hierarchy, or otherwise in a position of administrative responsibility over employees under him, such as a departmental or plant manager, so that such knowledge is important to the employee's general managerial duties. In this case, the employee usually has the authority to act on behalf of the employer to stop the harassment, for example, by disciplining employees or by

15

changing their employment status or work assignments. The employee's knowledge of sexual harassment is then imputed to the employer because it is significant to the employee's general mandate to manage employer resources, including human resources.

Second, an employee's knowledge of sexual harassment will be imputed to the employer where the employee is specifically employed to deal with sexual harassment. Typically such an employee will be part of the employer's human resources, personnel, or employee relations group or department. Often an employer will designate a human resources manager as a point person for receiving complaints of harassment. In this circumstance, employee knowledge is imputed to the employer based on the specific mandate from the employer to respond to and report on sexual harassment.

This approach to imputing an employee's knowledge to the employer is, moreover, consistent with the ordinary meaning of the term "management" in the context of referring to "management level" employees. Indeed, "management," in this context, means "the collective body of those who manage or direct an[] enterprise or interest: the board of managers[;] employer representation in an employer-employee relationship—opposed to *labor*." *Webster's Third New Int'l Dictionary* 1372 (1966) (emphasis in original). Thus, in requiring that a "management level" employee have knowledge of allegations of co-worker sexual harassment as a pre-requisite

16

to imputing that knowledge to the employer, we require that this knowledge have reached an employee in the governing body of the entity, as opposed to merely a supervisory employee in the labor force. We clarify that mere supervisory authority over the performance of work assignments by other co-workers is not, by itself, sufficient to qualify an employee for management level status. It is not uncommon for non-managerial co-workers to be organized into groups where one worker is designated to oversee the performance by others of a specific task. But to the extent that such a supervisor does not have a mandate generally to regulate the workplace environment, that supervisor does not qualify as management level.

The foregoing approach is also consistent with the negligence standard which we apply to determine employer liability in cases of non-supervisory co-worker sexual harassment. Although an employer has a duty to be reasonably diligent in attempting to discover co-worker harassment, and to respond promptly and appropriately to that harassment, an employer is not expected to know every instance of harassment that may occur between co-workers. Such a requirement would effectively saddle employers with strict liability for co-worker harassment, contrary to the standard of negligence. *Parkins*, 163 F.3d at 1035 ("An employer's legal duty in co-employee harassment cases will be discharged if it takes reasonable steps to discover and rectify acts of sexual harassment by its employees." (citation omitted)).

17

In considering Huston's case, the District Court concluded that Romanchick and Traver did not qualify as management level employees. We agree. Linda Sheehan testified that P&G hired two types of employees at the Mehoopany plant: technicians and managers. She explained that managers were salaried employees who have the authority to hire, discipline, and discharge technician employees, whereas technicians were paid hourly wages and did not have the authority to hire, discipline, and discharge. Romanchick and Traver were technicians. Although they happened to perform some oversight functions as process coach and machine leader, respectively, they remained technicians, generally practicing the same skills and often performing substantially the same functions as the other members on Huston's work team. They were never managers.

As supervisors, Romanchick and Traver simply oversaw the production line work of their fellow technicians. The scope of their duties was limited to ensuring that the technicians were tending to their jobs so that the machines ran smoothly. Their responsibilities focused on the mechanical operation of the production line. They had no authority to affect the employment status of their teammates. Nor did they otherwise have the corporate authority to police for and to stop harassment, or the managerial duty to report any rumors of potential harassment that they might hear about. In short, P&G did not employ them to discover or to act upon knowledge or rumors of sexual harassment; Romanchick and Traver were employed to keep

18

machines working.

On the other hand, managers at the plant did have the authority and responsibility to act on information about sexual harassment. In deposition testimony, Huston acknowledged that department manager Francisco Lanza was her immediate supervisor. Lanza was responsible for her team and met with its members on a daily basis. He possessed the authority to make staffing decisions and other decisions relevant to the employment status of technicians. He could have technicians moved from one team to another. As manager, Lanza was employed to resolve a broad range of operational issues. He also had the authority to act on reports about sexual harassment.[5]

Huston suggests, however, that Romanchick had the authority and responsibility of a management level employee because he had the authority to "turn in" Huston when she was caught fabricating machine log data. According to Huston, if Romanchick could report on her after she admitted to fabricating data, he also had an obligation to report allegations of sexual

---

[5] Huston cannot argue that she *believed* Romanchick and Traver had the authority to act on information about sexual harassment because she never complained to Romanchick and Traver herself. She never relied on any apparent authority to stop harassment. She contends instead that, on May 14, 2004, Romanchick and Traver heard from another employee about the May 13 control room incident.

harassment that came to his attention.

There are two significant problems with Huston's argument. First, as process coach, Romanchick was specifically responsible for the integrity of machine log data. Data fabrication issues were thus integral to his duties of keeping the machines online. Reporting sexual harassment, however, was not. Second, at the time Huston was caught, P&G had recently announced that it would not tolerate data fabrication. Indeed, Regina Gray had met with all the technicians, including Huston, to explain how the plant would sanction data fabrication in the future. As part of its effort, P&G management had asked Romanchick and other technicians to sign a statement declaring that they would report any data fabrication they observed. When Romanchick signed that statement, he specifically committed himself to policing data fabrication pursuant to his responsibility for the integrity of machine log data. The fact, then, that Romanchick informed his manager that Huston had fabricated data does not signify that he qualified as a management level employee for the purpose of imputing to P&G his knowledge that a male teammate had engaged in behavior that was sexually harassing in nature.

Finally, Huston's own actions indicate that she knew and understood the hierarchy at the plant and the fundamental difference in the duties of managers and technicians. When she decided to lodge a formal complaint on June 30, 2004, she approached managers—not Romanchick or Traver. She reported

her concerns to Regina Gray, and to Human Resources Manager, Linda Sheehan.

In our view, the record taken as a whole could not lead a reasonable trier of fact to find for Huston. Rather, the record compels the conclusion that Romanchick and Traver were technicians and not management level employees for purposes of imputing to P&G their knowledge of potential co-worker harassment. Consequently, we find that P&G had notice of Huston's allegations of harassment on June 30, 2004—the date Huston lodged a complaint with two P&G managers. The only remaining question, then, is whether P&G took prompt and adequate remedial action as of June 30, 2004. *See Weston*, 251 F.3d at 427 (citing *Kunin*, 175 F.3d at 293).

An employer's remedial action is adequate "if it is reasonably calculated to prevent further harassment." *Knabe*, 114 F.3d at 412 n.8. Accordingly, the employer cannot be liable under Title VII if its remedial action stopped the harassment. *Id.* ("A remedial action that effectively stops the harassment will be deemed adequate as a matter of law."). Here, P&G launched an investigation on the very day Huston filed her complaint. Moreover, P&G had previously moved Huston to a different team to accommodate her physical limitations, and Huston never had to work with her alleged harassers again. As part of the investigation, P&G management interviewed various individuals who Huston mentioned in her complaint. P&G also disciplined every employee it found to have violated company policies.

21

Huston objects to the leniency of the sanctions P&G imposed on her co-workers, but she does not dispute the fact that no further sexual harassment occurred after she reported her concerns to P&G managers. Accordingly, we agree with the District Court that the record does not present a genuine issue of material fact as to whether P&G responded promptly and adequately to Huston's complaint. We will, therefore, affirm the District Court's judgment as to Huston's hostile work environment claims under Title VII and the PHRA.[6]

---

[6] Huston also claimed that her employment was terminated on October 21, 2004 in retaliation for her complaint of June 30, 2004. The District Court determined that Huston could not make out claims of retaliation because she could not establish the requisite "causal link" between her complaint and the termination of her employment. *See Weston*, 251 F.3d at 430. Alternatively, the District Court concluded that P&G had a legitimate non-discriminatory reason to terminate Huston's employment: she had fabricated machine log data shortly after receiving a warning from management that data fabrication would not be tolerated, and she was already on step four discipline (with step five being termination) for a serious safety violation. The District Court concluded that Huston could not demonstrate that P&G's reason for terminating her employment was pretext. We agree with the District Court on both issues and, accordingly, we will affirm the District Court's judgment as to Huston's retaliation claims.