STAFFORD, District Judge,
dissenting.
With deference and respect to the district court and to the majority, I must nevertheless dissent. I do so because I believe that Neely has established a genuine issue of material fact as to her hostile work environment and constructive discharge claims.
I.
Neely presented evidence of the following:
Neely worked as an hourly crew person at the McDonald’s Green Tree restaurant in Crafton over the course of twelve years, taking time off after the births of each of her three children. Carter was transferred to the Green Tree restaurant approximately one month after Neely was rehired following the birth of her third child. During the relevant time period, Carter was second in the store hierarchy under Bellock, the restaurant manager. Swing managers were below Carter in the hierarchy. Whenever Bellock was out of the restaurant, the employees, including Neely, looked to Carter as the person “in charge.” Indeed, Neely considered him to be her “boss;” and, when asked at her deposition whether Carter could have fired her, she replied: “As far as I know.”
Soon after he started working at the Green Tree restaurant, Carter intentionally grabbed Neely’s left breast with his full hand as Neely was reaching for a bag in the sandwich chute. Neely did not immediately report the incident because Carter “was always there.” Instead, when she left work that day, she called Barbara Richards, the swing manager who generally worked the same shift as Neely, telling Richards exactly what had happened. Richards, who was at home at the time, advised Neely to make a written record of the incident before meeting with Bellock and Richards the next day. Richards then called the restaurant to inquire about the day’s video tapes. The manager on duty at the time told Richards that the cameras had not been turned on that day.
Consistent with Richards’s instructions, Neely submitted a written report about the incident to Bellock the very next day. According to Neely, Bellock said that Neely’s complaint — which was not the first such complaint submitted to Bellock— would be turned over to Menzer. McDonald’s gave Bellock, as the store manager, no authority to discipline her assistant managers; instead, she was required to contact Menzer or Human Resources Consultant C.C. Coleman whenever she thought an assistant manager required disciplinary action.
Menzer thereafter initiated an investigation. In the weeks that followed, hearing nothing from Menzer or Coleman, Neely asked Bellock on several occasions what was being done about Carter. Bellock, who knew little more about the investigation than Neely, responded by saying that McDonald’s would probably do nothing about the situation. In the meantime, Carter’s behavior did not improve. Indeed, there were occasions when he rubbed the side of Neely’s leg with his hand, called her “babe,” blew into the hair by her ear, and — on as many as 20 occasions — pressed against her back with his full body so that she could feel his penis. Neely complained about Carter’s conduct to Bellock, telling Bellock that she did not want to work the same shift as Carter. During the course of the investigation, Neely was never interviewed by either Menzer or Coleman.
Throughout the months that Carter worked at the restaurant, Neely observed Carter treating other crew members in an inappropriate manner. For example, Neely saw a crew member named India punch *88 Carter after he grabbed her in a bear hug. She saw Carter “rub up” against yet another crew member named Bobbie, who— Neely says — submitted a written complaint about the rubbing. She saw Carter put his hands between Richards’s legs, ostensibly to help Richards wipe off the water she had spilled on herself. Richards told Neely that she (Richards) reported the incident to Belloek.
At or about the same time that Neely was reporting Carter’s inappropriate behavior, at least two other crew members (Kaitlyn and Rebecca) similarly complained about Carter’s conduct. Among other things, Kaitlyn reported — in writing — that Carter put his arms around her, called her “sexy,” and placed his hands on her hips at least a few times every time she worked with him. Rebecca reported similar inappropriate behavior, also in writing. Belloek admits that she received these other complaints, that Menzer was told about the complaints, and that she (Belloek) was involved in the ensuing investigation of Kaitlyn’s and Rebecca’s complaints. Belloek was not, however, involved in the investigation of Neely’s complaints, and Menzer did not solicit Bel-lock’s input as to what disciplinary action, if any, should be meted out to Carter. While Belloek says she never saw any of Carter’s inappropriate behavior, she believed “to a certain extent” what Neely, Kaitlyn and Rebecca reported simply “because there were one, two, and three.”
When first alerted about Neely’s complaint, Menzer instructed Belloek to pull the videotapes from the relevant days. Belloek was unable to produce any video tapes because the video system was broken. According to Menzer, the system was replaced years later. During her investigation, Menzer interviewed six to eight employees (including Belloek and Carter) at the Green Tree restaurant, taking written statements from anyone who wished to submit such a statement. Richards submitted a statement that included: “I was in drive-through and [Carter] came over and was rubbing my back. I moved, and then I was by the drive-through cart and he grabbed my hand.” Nicole Watts submitted a statement, complaining that “[Carter] makes me feel like I’m worthless and demoralized.” Rebecca submitted the following statement:
[Carter] would go behind Kaitlyn and I[sic] and grab our waists from behind us.... Also [Carter] was standing in front of the fry station and ... he backed up into my chest and starting rubbing his back on my chest and told me I had a nice upper chest area if I know what he means.... I’ve seen him grab Kaitlyn’s butt. He took me into the stockroom and came really close to my face asking me to stay until eleven. I asked him why he wanted me to stay, and he said: “You know I’ll make it up to you,” and he winked.
Kaitlyn submitted a statement that included the following:
[Carter] pinched my side. When I told him to get off he pinched harder. He picked me up after I told him not to touch me. He has made numerous comments to me that I have attempted to block out of my mind simply because I like my job and was trying not to let it get to me.
At least two weeks after Neely, Kaitlyn, and Rebecca submitted their complaints about Carter, and without ever talking with Neely, Menzer issued Carter a written warning for violating McDonald’s zero tolerance policy. The warning was based on “unacceptable behavior and language being used with a crew person.” Menzer instructed Belloek to thereafter schedule Neely and Carter on different shifts. Indeed, Menzer also instructed Belloek to *89 keep Carter separated from Kaitlyn and Rebecca. Bellock admits that, after she received Menzer’s instructions, “it wasn’t okay to schedule [Carter and Neely] together.”
For a brief period of time, Bellock scheduled the restaurant’s shifts so that Carter and Neely were not working at the same time. For reasons that are unclear, however, the two were soon again scheduled for overlapping shifts. At first, Neely’s and Carter’s shifts overlapped by only an hour, and few, if any, problems arose. When them shifts reverted to a four-hour overlap, Neely again complained that she could not work with Carter, that he leered at her, called her “babe,” and touched her in offensive ways. Carter also continued to act inappropriately with other employees. Weeks after Carter was reprimanded, for example, Neely saw Carter “hanging all over” a foreign exchange student who worked for about a month at the restaurant, making everyone feel uncomfortable, including another crew member who went straight to Bellock to complain about Carter’s conduct. Neely was so unhappy about having to again work the same shift as Carter that she would get physically sick in the mornings, vomiting as she waited outside the restaurant “until exactly that minute I had to be there.” Expecting — as Bellock had advised- — that McDonald’s would probably do nothing else to rectify the situation, Neely quit her job.
Two weeks later, Neely received a letter from McDonald’s, extending Neely an unconditional offer to return to work at the Green Tree restaurant and informing her that Carter had been transferred to another restaurant. She refused the offer, explaining that McDonald’s had taken too long to adequately address the Desi Carter situation, that the company failed to respect and properly protect its crew members, and that she was simply “upset with them because they didn’t do anything.”
II.
To prevail on a claim of sexual harassment by a co-worker,[4] Neely must prove— among other things — that McDonald’s “knew or should have known about the harassment, but failed to take prompt and adequate remedial action.” Andreoli v. Gates, 482 F.3d 641, 644 (3d Cir.2007). Any dispute regarding the promptness and adequacy or appropriateness of management’s remedial action is a factual issue for the jury to decide. See Id. (reversing district court’s grant of summary judgment in favor of employer where there was a genuine factual dispute as to whether the employer’s purported remedial actions to address ongoing harassment were prompt and adequate); see also Howard v. Burns Bros., Inc., 149 F.3d 835, 841 (8th Cir.1998) (noting that “the promptness and adequacy of the employer’s response to a complaint of harassment are fact questions for the jury to resolve”). The appropriate corrective response will vary according to the severity and persistence of the alleged harassment. See, e.g., Calderon v. Ford Motor Credit Co., 300 Fed.Appx. 362, 371 (6th Cir.2008); Kreamer v. Henry’s Towing, 150 Fed.Appx. 378, 382 (5th Cir.2005). A remedial action that stops the harassment is adequate as a matter of law. Knabe v. Boury Corp., 114 F.3d 407, 411 n. 8 (3d Cir.1997).
*90 Here, the district court determined that the remedial actions taken by McDonald’s were both prompt and adequate as a matter of law. According to the district court, Neely “stated in her deposition that she was never harassed after McDonald’s investigation.” Having determined that the reprimand received by Carter stopped the harassment, the district court concluded that no reasonable juror could find that McDonald’s remedial action was anything other than prompt and adequate.
In fact, when the evidence is construed in a light most favorable to Neely, as it must be on a motion for summary judgment, it cannot be said that Carter altogether ceased his harassing behavior after he was reprimanded. As recognized by the majority, there is evidence that Carter’s conduct toward Neely and others continued to be “offensive and inexcusable” up until the day she quit. Weeks after he was reprimanded, Carter called her “babe,” leered at her, squatted down next to her leg, and made her feel uncomfortable by “hanging all over” other crew members. To be sure, Neely said in her deposition that she experienced no harassment during the brief time when Carter was assigned to a completely different shift and that she remembered no specific incident of harassment during the brief time their shifts overlapped by only an hour. Her deposition testimony is unclear, however, about what happened when — contrary to Menzer’s put-them-on-different-shifts instruction — Carter’s shift again overlapped Neely’s by as much as four or more hours. When asked if she recalled any incidences of harassment during that time period, Neely responded: “I didn’t let it get that far.... I left.” Her response does not necessarily mean that Carter altogether ceased his untoward behavior after he was reprimanded.
The evidence submitted by Neely, if taken as true, reveals that McDonald’s put Carter “in charge” of a mostly female crew in a relatively confined setting. His behavior toward Neely was egregious, involving — among other things — offensive physical touching. His behavior, moreover, was not confined to Neely alone but involved several other women who — likewise—complained of offensive physical touching. Neely not only experienced Carter’s offensive conduct directly but she also observed his untoward conduct toward others. Similarly, Kaitlyn and Rebecca both experienced Carter’s harassment themselves and also observed others being treated in like fashion. The harassment, in other words, was severe as well as pervasive, creating an atmosphere that made Neely and others feel very uncomfortable.
Despite receiving three contemporaneous complaints from three different women, all complaining of offensive physical touching by Carter, it took Menzer two weeks to conduct an investigation. During that investigation, Menzer never talked with Neely. Menzer did, however, receive statements from other employees who reported similar experiences with Carter’s inappropriate behavior. To her credit, Menzer thereafter instructed Bellock to put Carter on the night shift so that he would not be working the same shift as Neely. That instruction was followed for less than a month.
When Neely again complained that she could not work with Carter, that he leered at her, called her “babe,” and squatted next to her leg, she was told that McDonald’s would likely do nothing more to remedy the situation. Because she became physically ill on days that she was scheduled to work with Carter, and because she was given no reason to think that McDonald’s would take further action against Carter, Neely quit her job.
*91 Given the egregiousness of Carter’s conduct to Neely and others, the “in charge” role Carter often played at the restaurant, the close-quarters in which Neely and Carter worked, Carter’s continuing offensive behavior, and Bellock’s statement that McDonald’s would likely do nothing more to remedy the situation, a jury should be permitted to decide whether the remedial action taken by McDonald’s was both prompt and adequate.
Just as the adequacy of an employer’s remedial action is normally a factual question for the jury, so too is the question of whether working conditions were so intolerable as to justify a reasonable employee’s decision to resign. Here, given the totality of the circumstances already described, a reasonable jury could decide that, by failing to fire Carter after he engaged in any post-reprimand inappropriate behavior, McDonald’s not only failed to abide by its own zero tolerance policy, but it also put Neely in the intolerable situation of having to work closely with a man whose behavior was inexcusable, especially before but also after his reprimand.
III.
Because I believe the district court l-e-solved issues of disputed fact that should have been submitted to a jury, I would reverse the district court’s grant of sum-mai*y judgment in McDonald’s favor and remand for a trial on Neely’s claims.

. I agree with the majority's conclusion that Carter was not a ''supervisor” for purposes of holding McDonald's vicariously liable under Title VII. Because Carter was a low-level manager who did not use whatever supervisory authority he had to carry out the harassment, his situation is indistinguishable from cases in which the harassment is perpetrated by an employee’s co-worker.