**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-3414
_____

In re:  WL HOMES, Debtor

WACHOVIA BANK NATIONAL ASSOCIATION

v.

WL HOMES LLC; JLH INSURANCE CORPORATION; GEORGE L. MILLER

George L. Miller; JLH Insurance Corporation,

Appellants

_____

No. 12-3493
_____

In re:  WL HOMES, LLC,
                                        Debtor

WACHOVIA BANK NATIONAL ASSOCIATION,

Appellant

v.

WL HOMES LLC; JLH INSURANCE CORPORATION; GEORGE L. MILLER

On Appeal from the United States District Court
for the District of Delaware
(Nos. 1:11-cv-00619, 1:11-cv-00621, 1:11-cv-00692)
District Judge:  Hon. Richard G. Andrews

Argued June 26, 2013

Before:  FUENTES, FISHER, and CHAGARES, Circuit Judges.

(Filed: August 08, 2013)
_____

OPINION
_____

Steven M. Coren, Esq. (ARGUED)
Brian L. Watson, Esq.
Kaufman, Coren & Ress, P.C.
Two Commerce Square, Suite 3900
2001 Market Street
Philadelphia, PA 19103-2713
        Counsel for Appellants/Cross-Appellees

Francis A. Monaco, Jr., Esq.
Thomas M. Horan, Esq.
Womble Carlyle Sandridge & Rice, LLP
222 Delaware Avenue, 15th Floor
Wilmington, DE 19801

James D. Whooley, Esq. (ARGUED)
Milbank, Tweed, Hadley & McCloy, LLP
601 S. Figueroa Street, 30th Floor
Los Angeles, CA 90017
        Counsel for Appellee/Cross-Appellant

CHAGARES, Circuit Judge.

In 2007, appellee/cross-appellant Wachovia Bank, National Association [1]

("Wachovia") extended a loan to WL Homes, LLC ("WL Homes").  In exchange, WL

Homes granted Wachovia a security interest in the $10 million bank account of a wholly-

owned subsidiary called JLH Insurance Corporation ("JLH").  WL Homes eventually

_____

[1]  After a merger, Wachovia is now Wells Fargo.  Because the documents in the record and the parties refer to the relevant entity as Wachovia, we will do the same.

2

filed a bankruptcy petition and Wachovia sought a declaration in United States

Bankruptcy Court for the District of Delaware that it had an enforceable security interest

in the JLH bank account. The Bankruptcy Court granted Wachovia's motion for

summary judgment, holding that Wachovia had a valid security interest in the account

because JLH had consented to the pledge and, in the alternative, because WL Homes had

use and control of the JLH account. The Chapter 7 trustee appointed to represent both

WL Homes and JLH appealed. The District Court affirmed the grant of summary

judgment on the basis of consent but reversed the use and control holding. Both parties

appeal the decision of the District Court. For the reasons that follow, we will affirm.

I.

In October 2007, WL Homes and Wachovia entered into a "Line of Credit Loan

Agreement" ("Loan Agreement" or "Agreement"). In the Agreement, Wachovia agreed

to extend a $20 million revolving line of credit to WL Homes. To secure the loan, WL

Homes, the borrower, pledged its interest in the JLH bank account as collateral to

Wachovia, the lender, through the following clause in the Agreement:

> Borrower shall maintain its JLH Insurance Co. primary
> deposit account ("the JLH Account") with Lender. The funds
> on deposit in the JLH Account shall at no time be less than
> $10,000,000. Borrower shall also maintain its Laing Luxury
> primary deposit accounts . . . with Lender. The JLH Account
> and the Laing Luxury Accounts are collectively referred to as
> the Deposit Accounts. Borrower grants to Lender a security
> interest in the Deposit Accounts. [In the event of default],
> Lender shall not be obligated to release to Borrower any
> funds from the Deposit Accounts . . . .

3

Appendix ("App.") B172 (emphasis added). WL Homes and Wachovia extended the loan with two letter agreements signed in June and July 2008. Those agreements reaffirmed the obligations set forth in the initial Loan Agreement.

The disputed account was held in the name of JLH. WL Homes formed JLH in 2005 as a wholly-owned, pure captive insurance company that could pay claims brought against WL Homes.[2] A pure captive insurance company insures the risks of its affiliates — here, the risks of WL Homes, its sole parent.[3] The disputed depository account at Wachovia Bank was opened in January 2008, shortly after execution of the Loan Agreement. According to WL Homes, JLH opened the account to fulfill Arizona's requirement that JLH, as a captive insurer, maintain a minimum level of capital in reserve to pay claims.

JLH was a wholly-owned subsidiary of WL Homes. All funds held in JLH's name were transferred from its parent company. Although JLH has its own formation documents and maintained its own books and records, WL Homes's financial statements reported JLH's assets as its own. Three of JLH's corporate officers also served on the board of WL Homes. The other two JLH board members were employees of Aon, the company hired to manage JLH as required by Arizona captive insurer requirements. An

---

[2] JLH is an Arizona corporation subject to that state's captive insurer statutes and regulations.

[3] In general, "[a] captive insurance company is owned by and run for the benefit of an operating company. Generally, the captive has few assets and employees and is reinsured." In re Petition of Bd. of Dirs. of Hopewell Int'l Ins., Ltd., 272 B.R. 396, 400 n.1 (Bankr. S.D.N.Y. 2002).

individual named Wayne Stelmar was the president of JLH[4] and the CFO of WL Homes at all relevant times. Stelmar negotiated the initial Loan Agreement and signed the two 2008 letter agreements that extended the loan.

In February 2009, WL Homes filed a Chapter 11 bankruptcy petition. Soon thereafter, the case was converted to a Chapter 7 action for liquidation and a trustee was appointed. On March 20, 2009, Wachovia filed the current action in Bankruptcy Court, seeking a declaratory judgment that Wachovia held an enforceable security interest in the JLH account and could enforce that interest to satisfy WL Homes's obligations to Wachovia. After discovery, Wachovia moved for summary judgment. The Chapter 7 trustee cross-moved, seeking a declaration that Wachovia's security interest was invalid.

The Bankruptcy Court granted the motion and denied the Chapter 7 trustee's cross-motion. The court identified two theories to support its conclusion that WL Homes had sufficient rights in the JLH account to promise it as collateral: (1) WL Homes had "use and control of the JLH account;" and (2) JLH consented to the use of its account as collateral. App. 40.

The trustee appealed to the United States District Court for the District of Delaware. The District Court held that WL Homes did not exert sufficient use and control over the JLH account to pledge it as collateral but affirmed the grant of summary judgment on the basis that JLH had consented to the pledge of its account as collateral.

---

[4] JLH's corporate bylaws gave its president the authority to "have general charge of the business of the corporation" and to "sign, in the name of the corporation, all authorized contracts, documents, checks and bonds, or other obligations." App. B404.

The trustee timely appealed to this Court, arguing that no theory supports the conclusion that Wachovia has an enforceable security interest in the JLH account. Wachovia cross-appealed, arguing that the District Court improperly rejected the alternative basis for enforcing the security interest — that WL Homes had sufficient use and control to pledge the JLH account as collateral.

## II.[5]

### A.

We exercise plenary review over a district court's grant of summary judgment. Chambers v. Sch. Dist. of Phila. Bd. of Educ., 587 F.3d 176, 181 (3d Cir. 2009). We will apply the same standard applied by the district court, id., and grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a).

### B.

We apply state law to determine "whether claims asserted by creditors in bankruptcy are secured." In re SubMicron Sys. Corp., 432 F.3d 448, 458 (3d Cir. 2006). The parties agree, as does the Court, that California law governs this action. Under California's Commercial Code, "[a] security interest attaches to collateral when it becomes enforceable against the debtor." Cal. Com. Code § 9203(a). A security interest in a deposit account becomes enforceable against the debtor when: (1) "value has been given;" (2) "the debtor has rights in the collateral or the power to transfer rights in the

---

[5] The District Court had jurisdiction over WL Homes's appeal from the final order of the Bankruptcy Court pursuant to 28 U.SC. § 158(a)(1). We have jurisdiction over an appeal from the judgment or order of the District Court pursuant to 28 U.S.C. § 158(d)(1).

6

collateral to a secured party;" and (3) the secured party has control over the deposit account. Cal. Com. Code § 9203(b) (emphasis added), § 9104. The parties dispute the second element: whether WL Homes had sufficient rights in the JLH account to pledge it as collateral for the Wachovia loan.

A debtor may pledge as security property it does not fully own, but may only pledge the rights that it has in the property. See In re Ferandos, 402 F.3d 147, 156 (3d Cir. 2005) ("It is hornbook law that the debtor can only grant a security interest in whatever rights he has in the collateral."); see also Official UCC Comment 6, § 9-203 ("A debtor's limited rights in collateral, short of full ownership, are sufficient for a security interest to attach. . . . . [T]he baseline rule is that a security interest attaches only to whatever rights a debtor may have, broad or limited as those rights may be."). There is no bright-line rule that specifies the "quantum of rights" in a particular piece of property that will allow a party to pledge it as collateral; "less than full legal title will do and the secured party will get whatever rights the debtor had." Ferandos, 402 F.3d at 156 (quotation marks omitted). The consent of the owner of the collateral is one way to give the debtor sufficient rights in the property to pledge it as security. See In re Atchison, 832 F.2d 1236, 1239 (11th Cir. 1987) ("[A]ll of the courts that have considered the question have ruled that an owner's permission to use goods as collateral creates rights in the debtor sufficient to give rise to an enforceable security interest.").

We must determine the quantum of rights that WL Homes had in the property of JLH, its wholly-owned subsidiary. We begin with the assumption that parent companies and wholly owned subsidiaries share the same interests. See In re Teleglobe Comm'cns

7

Corp., 493 F.3d 345, 366-67 (3d Cir. 2007) (applying Delaware law). We apply principles of agency to determine whether JLH had notice of and manifested its consent to the pledge of its account as collateral and will assume that, "[a]s against a principal, both principal and agent are deemed to have notice of whatever either has notice of, and ought, in good faith and the exercise of ordinary care and diligence, to communicate to the other." Cal. Civ. Code § 2332; see also Huston v. Procter & Gamble Paper Prods. Corp., 568 F.3d 100, 106 (3d Cir. 2009) (explaining that, "[f]or purposes of determining a principal's legal relations with a third party, notice of a fact that an agent knows or has reason to know is imputed to the principal if knowledge of the fact is material to the agent's duties to the principal" (quoting Restatement (Third) of Agency § 5.03 (2006))). An agent has a duty to disclose material information to the principal, and the principal is "deemed to have knowledge" of those facts. O'Riordan v. Fed. Kemper Life Assurance Co., 114 P.3d 753, 757 (Cal. 2005).

Two standards limit the knowledge that we will impute to the principal. First, we will only impute knowledge that is within the scope of the agent's duties. Huston, 568 F.3d at 107 ("[A] corporation is not charged with the legal consequences of an employee's knowledge of a fact that lies outside the scope of the employee's duties to the corporation"). Second, we will only impute knowledge that is material to the employee's duties to the employer. Id. "In other words, the employee's knowledge of facts may be imputed to the employer only if that knowledge is important to the function the employee is employed to perform." Id. Absent misconduct or malfeasance, the material knowledge of an agent is imputed to the principal, even if that knowledge was acquired in

8

another capacity as long as "that knowledge can reasonably be said to be present in the mind of the agent while acting for the principal." O'Riordan, 114 P.3d at 757 (quotation marks omitted); cf. Bank South, N.A. v. Midstates Grp, Inc., 364 S.E.2d 58, 61-62 (Ga. Ct. App. 1987) (holding that debtor lacked sufficient rights in collateral when non-debtor presented evidence of forgery with respect to the pledge).

Several jurisdictions, including California, have applied principles of imputation to situations in which individuals act in two capacities — either as an officer of both a parent and a subsidiary, or as a corporate officer and as an individual. In Northern Natural Gas Co. v. Superior Court, for instance, the California Supreme Court, considering an issue that did not involve a secured transaction, addressed a dual agency situation in which an individual who was the president of both a parent company and its wholly-owned subsidiary made representations in his capacity as the president of the subsidiary. 134 Cal. Rptr. 850, 856 (Cal. Ct. App. 1976). The court applied the "doctrine of imputed knowledge" to charge the parent company with the knowledge that the individual had gained in his capacity as president and chairman of the subsidiary. Id. ("The trial court had a right to conclude that Propane Gas as stockholder of Geni-Chlor elected Larson president of Geni-Chlor so that Larson as president of Propane Gas would be fully aware of what its wholly owned subsidiary was doing.").

In Matter of Pubs, Inc. of Champaign, 618 F.2d 432, 435-38 (7th Cir. 1980), the Court of Appeals for the Seventh Circuit considered a situation in which two individuals who were also the officers of the debtor corporation promised their own equipment as collateral for a loan from the bank. The debtor corporation later filed for bankruptcy and

9

the court held that the individuals had properly pledged the collateral and concluded that "[n]otice to the director of a corporation is notice to the corporation and estops the corporation and its receiver from questioning the validity of a prior transaction." Id. at 438. In Atchison, the Court of Appeals for the Eleventh Circuit, applying the Uniform Commercial Code, likewise held that the signature of the person who owned the collateral individually but pledged it on behalf of his corporation had manifested his consent to granting a security interest in the property. 832 F.2d at 1239-40 ("[E]ven if he did own the equipment, his signature for A & W was sufficient to infer his consent to its use as collateral."). A United States Bankruptcy Court has applied Atchison to facts similar to those presented here — to a situation in which the individuals who owned the property pledged as security (a coin collection) signed the security agreement in his capacity as a corporate officer. In re 4-R Management, Inc., 208 B.R. 232, 237 (Bankr. N.D. Ala. 1997). The court held that the owners' individual signatures on the security agreement "was sufficient to infer corporate consent to use the coins as collateral." Id. at 238.

Here, the trustee claims that the president of the subsidiary, Wayne Stelmar, acted only in his capacity as CFO for the principal, WL Homes, when he signed the two Letter Agreements that continued the pledge of the JLH account. We look to Stelmar's role and the relationship between WL Homes and JLH to determine whether to impute Stelmar's knowledge of the pledge of the Wachovia account to JLH. Stelmar served as president of JLH, served as CFO of WL Homes, negotiated the initial Loan Agreement, and signed the 2008 letter agreements that extended the loan. Stelmar was not the only dual agent.

10

The majority of JLH's board members were also officers of WL Homes. Stelmar had specific knowledge of the pledge of the account because he negotiated the Loan Agreement in which the security interest was granted in his capacity as CFO to one of the principals — WL Homes. Knowledge of that fact was material to Stelmar's duties to his other principal — JLH. JLH's bylaws specify the duties of the president: the president will "have general charge of the business of the corporation" and "may sign, in the name of the corporation, all authorized contracts, documents, checks and bonds, or other obligations." App. B404.

A pledge of a corporation's capital reserves undoubtedly involves the "general business" of the corporation and was well within the scope of Stelmar's duties as president. Stelmar was thus obligated "in good faith and the exercise of ordinary care and diligence" to communicate to JLH the fact WL Homes had pledged its account as collateral. Cal. Civ. Code § 2332. Stelmar need not have been acting specifically in his capacity as JLH's president when he received this information. Cf. O'Riordan, 114 P.3d at 757 (imputing agent's knowledge to the principal even though agent acquired the relevant information before the agency relationship began). The undisputed facts demand that we impute Stelmar's knowledge of the pledge of the JLH account to JLH. That knowledge manifests consent. We therefore conclude that Wachovia had an enforceable security interest and is entitled to judgment as a matter of law.[6]

---

[6] Because we hold that JLH consented to the pledge of its account as collateral for the loan, we need not reach the question of use and control raised in Wachovia's cross appeal.

11

III.

For the foregoing reasons, we will affirm the decision of the District Court that upheld the Bankruptcy Court's grant of summary judgment to Wachovia.