# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Emily Weaver, : 
                  Appellant : 
                : 
          v. :   No.  612 C.D. 2021
                :   Submitted:  May 6, 2022
MHM Correctional Services, Inc. : 
and Commonwealth of Pennsylvania, : 
Department of Corrections : 

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, President Judge
                HONORABLE CHRISTINE FIZZANO CANNON, Judge
                HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

**OPINION NOT REPORTED**

MEMORANDUM OPINION BY
PRESIDENT JUDGE COHN JUBELIRER      FILED: September 22, 2023

Emily Weaver (Weaver) appeals from the Order of the Court of Common Pleas of Centre County (trial court) granting the motions for summary judgment filed by the Commonwealth of Pennsylvania, Department of Corrections (DOC) and MHM Correctional Services, LLC, (MHM)[1] (collectively, Defendants).[2] Weaver

---

[1] On January 20, 2019, MHM Correctional Services, Inc., converted to a limited liability company now known as MHM Correctional Services, LLC. (*See* Amended Motion for Summary Judgment of MHM n.1, Reproduced Record (R.R.) at 1035a.). MHM provides mental health related services to individuals incarcerated at the State Correctional Institution at Rockview (Rockview).

[2] The trial court granted summary judgment in Defendants' favor by Order entered on February 4, 2020. Therein, the trial court also granted in part and denied in part the motion for summary judgment filed by another co-defendant, Richard Frank (Frank), a corrections officer (CO) at Rockview. Appellant ultimately settled her claims with Frank, and by virtue of that **(Footnote continued on next page…)**

filed numerous employment discrimination claims under the Pennsylvania Human Relations Act (PHRA)[3] against Defendants based on events she alleged occurred while she worked as a mental health worker at the State Correctional Institution at Rockview (Rockview). At issue is whether the trial court erred in granting summary judgment in favor of Defendants on Weaver's claims of a hostile work environment, constructive discharge, and retaliation. After thorough review, we agree the trial court did not err in granting summary judgment.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

In deciding Defendants' summary judgment motions, the trial court set forth the facts as follows:

> [Weaver] was employed as a mental health worker on the mental health unit [(MHU)] within [] Rockview. [Richard] Frank [(Frank)] was a correctional officer [(CO)] under the employment of [DOC]. [] DOC contracted with MHM for services relating to the mental health needs of inmates within [] Rockview.
>
> It is undisputed that [Weaver] and Frank engaged in consensual sexual relations on two separate occasions. The first was during the summer of 2015, where the two parties met at WalMart in State College and agreed to go to a hotel. [Weaver] alleges the following day Frank became more physical with her at work, and disregarded all requests to stop, persisting in inappropriate comments and attempts to reach under her clothing and kiss her. [Weaver] claims at one point, Frank trapped her in the CO office and would not let her leave until she let him touch her. Over time, Frank made several more attempts to persuade [Weaver] to meet with him outside of work, and [Weaver] eventually agreed due to fear of retaliation and "thinking that the physical issues would abate."[]

settlement, Frank is no longer a party to this action. The claims against Frank were marked as withdrawn by Order dated March 3, 2021, after which this appeal was timely filed.

[3] Act of October 27, 1955, P.L. 744, *as amended*, 43 P.S. §§ 951-963.

2

The incident in question occurred on March 10, 2016. [Weaver] was in the CO office attempting to sell skincare products to a co-worker when Frank entered, demanding she leave the office. When [Weaver] refused, she claims he grabbed her right arm and twisted it behind her back. A written report filed by [Weaver] indicates she first reported the incident to Sergeant Steven Shuss ([]Shuss[]) on March 11, 2016. When asked why she reported it to Shuss, she stated he was the only Sergeant she felt somewhat familiar with and who was not close friends with Frank. [Weaver] asked Shuss to promise not to tell anyone and not to put anything in writing, although [Weaver] typed her own report according to her deposition testimony[]. That same day, Shuss notified [Weaver] he spoke with Frank, and Frank agreed to be more "professional." Shuss also told [Weaver] she should tell her supervisor, but it was up to her.

[Weaver] next reported the incident to Captain Dyke ([]Dyke[]), on March 14, 2016, which prompted the investigation. [Weaver] also reported the incident to her MHM supervisor on March 14, 2016[,] upon leaving work. [Weaver] took a scheduled day off on March 15, 2016. When she returned to work on March 16, 2016, [a] DOC security captain and lieutenant had already spoken with Frank, another CO and an MHM nurse regarding the investigation and requested to speak with [Weaver]. During that conversation, they informed her the three individuals they had already spoken with told them it was [Weaver] who initiated contact with Frank. At some point during that conversation, [Weaver] told the security captain and lieutenant she did not feel comfortable and needed to quit. She then collected her belongings and left. When she arrived home, she called her MHM supervisor and informed her of the resignation.

(Trial Court Opinion and Order, 2/4/20 (Op.) at 1-3 (footnotes omitted).)

In a letter of resignation dated March 20, 2016, Weaver stated she had "fil[ed] a report against work[]place violence," which resulted in "harassment, discrimination, being ostracized by [her] coworkers, and going up against a brotherhood that will lie for each other to save their own job." (Reproduced Record (R.R.) at 294a.) Weaver further indicated she was "forced [] to quit [her] position due to a hostile work environment, having no sense of protection or safety while

3

working in a correctional facility, and having the reassurance that policies and procedures for the facility will not be followed through." (*Id.*) She concluded the letter by noting that she "appreciate[d] all the assistance that MHM [] and []Rockview did not give [her] for filing a report against workplace violence." (*Id.*) Upon completion of its investigation into the arm-twisting incident, DOC determined Frank violated several of DOC's policies against workplace violence. (R.R. at 828a.)

In October 2016, approximately six months after her resignation, Weaver filed a complaint with the Pennsylvania Human Relations Commission (PHRC) setting forth allegations of sexual harassment, discrimination, retaliation, and constructive discharge that formed the basis of the instant action. (R.R. at 1174a-82a.) On October 13, 2017, Weaver initiated the instant action against the Defendants and Frank.

After the close of discovery, DOC filed its Motion for Summary Judgment, wherein DOC asserted Weaver had failed to produce evidence to sustain a claim against it under the PHRA because DOC was not her employer. (R.R. at 131a, 145a-146a.) DOC also argued Weaver could establish neither a claim for a hostile work environment nor for constructive discharge, in that she did not complain to anyone at DOC about Frank's alleged conduct until March 11, 2016, at which time she only complained of Frank's grabbing her arm. DOC asserts it took prompt action to investigate her complaint; however, Weaver quit her job before it could complete its investigation. (*Id*. at 146a-48a.) Stating that Weaver voluntarily left employment and presented no evidence to show how she had been retaliated against for lodging her complaint against Frank, DOC also contended that even assuming her complaint

4

constituted a protected activity, Weaver could not establish a claim for retaliation as a matter of law. (*Id*. at 149a-150a.)

In its Amended Motion for Summary Judgment, MHM did not deny it was Weaver's employer but argued that the record evidence failed to establish a hostile work environment. MHM reasoned that Weaver did not report the single arm-twisting incident until just before she resigned, and Frank's refusal to permit Weaver to enter the CO's office on the day of her resignation did not create a hostile workplace. (*Id*. at 1045a, 1049a-51a.) MHM also alleged Weaver admitted that she never told MHM management or human resources about Frank's alleged harassing behavior, and, therefore, her constructive discharge claim fails as a matter of law. (*Id.* at 1051a-54a.) Finally, to the extent Weaver had claimed her report to DOC and MHM is a protected activity, MHM stated she did not allege action that would have constituted retaliation under the law. (*Id.* at 1055a-56a.)

The trial court heard argument on the respective summary judgment motions and in an Opinion and Order granted Defendants' motions on February 4, 2020. The trial court determined DOC was not a joint employer of Weaver, and, therefore, Weaver's PHRA claims against it necessarily failed as a matter of law. The trial court further found that Weaver had not established the essential elements of her claims against MHM. After the remaining claims were resolved against Frank, who was also a named defendant in the action, judgment was entered for Defendants, and Weaver filed a timely Notice of Appeal.[4]

In her brief, Weaver presents several issues for this Court's review.[5] Weaver alleges that due to Frank's unwanted sexual advances, touching, and sexually

---

[4] The appeal was originally filed in the Superior Court but was transferred to this Court after DOC filed an uncontested application to transfer.

[5] We have reordered Weaver's issues.

charged comments, MHM and DOC subjected her to a hostile work environment. Weaver further contends that the failure of MHM and DOC to take remedial action in response to her harassment complaints resulted in unlawful retaliation and led to her constructive discharge. Weaver also argues that as a mental health worker assigned to work at a corrections facility, she was jointly employed by MHM and DOC. Because we find that Weaver has not met her burden in this case, even if she was jointly employed by MHM and DOC, we leave for another day whether a mental health worker assigned to work at a corrections facility can ever be jointly employed by DOC.

## II. DISCUSSION

This Court's standard of review of the grant of summary judgment is *de novo*, and our "scope of review over an order granting summary judgment is limited to a determination of whether the trial court abused its discretion or committed an error of law." *Texeira v. Commonwealth*, 284 A.3d 1279, 1283 n.2 (Pa. Cmwlth. 2022) (citations and internal quotation marks omitted). In employing our standard of review, we are mindful that

> [a] trial court should grant summary judgment only in cases where the record contains no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. The moving party has the burden to demonstrate the absence of any issue of material fact, and the trial court must evaluate all the facts and make reasonable inferences in a light most favorable to the non-moving party. The trial court is further required to resolve any doubts as to the existence of a genuine issue of material fact against the moving party and may grant summary judgment only where the right to such a judgment is clear and free from doubt. . . .

*Bourgeois v. Snow Time, Inc.*, 242 A.3d 637, 649-50 (Pa. 2020) (internal citations and quotation marks omitted).

6

## A.  Hostile Work Environment

### 1.  Parties' Arguments

Weaver asserts the trial court essentially ignored evidence from which a reasonable factfinder could conclude that she was regularly subjected to a hostile work environment based on her sex. Weaver testified that Frank repeatedly physically and verbally sexually harassed her from the summer of 2015 until the conclusion of her employment in March 2016. (Weaver's Br. at 47-50 (citing R.R. at 195a, 199a).) Weaver maintains the question of whether Frank was her supervisor is a factual issue, and she testified not only that Frank was her supervisor, but also that he had the authority to put a stop to harassment in the unit. For instance, Weaver stated Frank at times required her to work from his office rather than from the cell block and permitted her to chart information pertaining to inmates in only certain locations, in violation of policies that stated she could chart inmates as she deemed appropriate. Weaver asserted Frank did this despite Weaver's pleas for him to stop his behavior. (*Id.* at 51-54 (citing R.R. at 182a, 186a-87a).) For this reason, Weaver posits that even if this Court were to find Frank was not her supervisor, DOC knew or should have known of the harassment, which included his "lock[ing] her in an office, comment[ing] about her looks, demand[ing] to have sex with her outside of work, [] other corrections officers[] sen[ding] her pictures of [themselves] naked and demand[ing] that she reciprocate[,]" and failing to take prompt action. (*Id.* at 55.)

DOC argues that because it was not Weaver's employer and Frank was not her supervisor, her PHRA claims must fail as a matter of law. (DOC's Br. at 19, 30.) Although arguing it was not her employer, DOC posits that even if it were

Weaver's employer and Frank had been her supervisor, Weaver's hostile work environment claim fails as the record lacks any evidence that DOC had actual or constructive knowledge of Frank's alleged harassing behavior. According to DOC, Weaver failed to pursue the proper channels to report Frank's alleged behavior. (*Id.* at 30-33.) DOC asserts that Weaver did not report any aggressive conduct or sexual harassment by Frank to a supervisor at MHM or to DOC management. (*Id.* at 11.) DOC states that when Weaver did formally accuse Frank of assaulting her in the security office on March 10, 2016, both DOC and MHM investigated the incident immediately, and Frank ultimately was disciplined for violating DOC's policy against workplace violence on March 31, 2016. (*Id.* at 12-14.) After Weaver filed her complaint with the PHRC, DOC began a second investigation into Frank, which ultimately found Weaver's sexual harassment allegations to be "unfounded." (*Id.* at 15.)

Similarly, MHM argues the trial court did not commit an error of law or abuse of discretion in granting summary judgment on Weaver's hostile work environment claim because there was no respondeat superior liability. (MHM's Br. at 37.) MHM posits Frank was not Weaver's supervisor, but rather, "at best," a co-worker who had no authority or control over her employment. (MHM's Br. at 37-38.) MHM agrees with the trial court that it can be liable under this theory only if the record shows it failed to provide a reasonable avenue for Weaver to lodge a complaint or should have known about Frank's behavior and failed to take appropriate remedial action. (*Id.* at 38.) MHM states that "[a]lthough [Weaver] proffers a lurid litany of slurs and abuse," in light of the fact that Weaver's arguments on this claim are directed toward DOC, and she admittedly reported Frank twisted her arm to MHM on March 14, 2016, just two days before her resignation, liability for the other

8

alleged harassment by Frank cannot attach to MHM. (*Id.* at 38-40.) MHM asserts Weaver identified only one incident of alleged discrimination by MHM, namely, the refusal by Deborah Kawtoski, the Mental Health Unit Director at Rockview, to allow Weaver to enter the CO's office in the future, which Weaver admits applied not just to her but to all mental health workers, regardless of their gender. (*Id.* at 39-40.)

      2.     *Analysis*

The PHRA provides that "[i]t shall be an unlawful discriminatory practice, unless based upon a *bona fide* occupational qualification . . . (a) [f]or any employer because of the . . . sex . . . of any individual . . . to otherwise discriminate against such individual . . . ." Section 5 of the PHRA, 43 P.S. § 955(a). This prohibition of discrimination on the basis of one's sex "has been interpreted to include sexual harassment that is severe or pervasive enough to create a hostile work environment." *Phila. Hous. Auth. v. Am. Fed'n of State, Cnty. & Mun. Emps.*, 956 A.2d 477, 484 (Pa. Cmwlth. 2008). In this regard, this Court has stated:

> In order to prima facie establish a hostile work environment under the PHRA, a complainant must demonstrate that [the complainant]: 1) suffered intentional discrimination because of [the complainant's] race or gender; 2) the harassment was severe or pervasive and regular; 3) the harassment detrimentally affected [the complainant]; 4) the harassment would detrimentally affect a reasonable person of the same protected class; and 5) the harasser was a supervisory employee or agent. *Barra v. Rose Tree Media Sch. Dist.,* 858 A.2d 206, 215 (Pa. Cmwlth. 2004) . . . .
>
> In determining whether a working environment is sufficiently hostile or abusive, courts must look to the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The conduct must constitute an objective change in the terms and conditions of employment. Thus, simple teasing, offhand

9

comments, and isolated incidents (unless extremely serious) are not actionable under the PHRA.

*Infinity Broad. Corp. v. Pa. Hum. Rels. Comm'n*, 893 A.2d 151, 158 (Pa. Cmwlth. 2006) (internal citations and quotation marks omitted). "These standards for judging hostility are sufficiently demanding to ensure that [hostile work environment claims] do[] not become a 'general civility code'. . . . Properly applied, they will filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citation omitted).

Furthermore, "[t]he basis of an employer's liability for hostile environment sexual harassment depends on whether the harasser is the victim's supervisor or merely a coworker." *Huston v. Procter & Gamble Paper Prods. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009). As the Superior Court has observed:

> [A]n employer will be held liable for a discriminatorily abusive work environment created by a supervisor, if the supervisor uses his actual or apparent authority to further the harassment, or if he was otherwise aided in accomplishing the harassment by the existence of the agency relationship. *Karibian v. Columbia Univ*[.]*,* 14 F.3d 773, 780 (2d Cir.1994). Where a low-level supervisor does not rely on his authority to carry out the harassment, the situation is indistinguishable from a case in which the harassment is perpetrated by the plaintiff's co-worker, and the supervisor will not be deemed an agent of his employer. *Id.* Moreover, an employer will not be held liable for misconduct based upon the apparent authority of its supervisor where it would be unreasonable for the harassed employee to believe that such conduct was the employer's policy. *Bouton v. BMW of N*[.] *Am*[.]*, Inc.,* 29 F.3d 103, 109 (3d Cir. 1994). Whether the authority to harass has been communicated or repudiated by the employer may be determined objectively from the work environment created or tolerated by the employer. *Id.*

*Hoy v. Angelone*, 691 A.2d 476, 480-81, (Pa. Super. 1997), *aff'd*, 720 A.2d 745 (Pa. 1998).[6]

In addition, as the United States Court of Appeals for the Third Circuit has explained,

> [w]hen the hostile work environment is created by a victim's non-supervisory coworkers, the employer is not automatically liable. Rather, employer liability for co-worker harassment exists only if the employer failed to provide a reasonable avenue for complaint or, alternatively, if the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action. That is, an employer may be directly liable for non-supervisory co-worker sexual harassment only if the employer was negligent in failing to discover the co-worker harassment or in responding to a report of such harassment.

*Huston*, 568 F.3d at 104.

Weaver testified that after she had a consensual sexual encounter with Frank, his behavior toward her became more aggressive at work. Prior to that time, Frank would "touch [Weaver's] back when he talked to [her] or give [her] hugs anytime he could." (Weaver Dep. at 88; R.R. at 194a.) Weaver described Frank's physical contact with her thereafter in September 2015 as involving attempts to reach under her shirt or pants or "trap" her and kiss her in the CO office. Weaver testified she was not receptive to these advances and told Frank to stop, but the behavior continued. (Weaver Dep. at 90, 105-07; R.R. at 195a., 199a.) Weaver said there were times when Frank, whom she argues was a supervisor, would not allow her to conduct her group sessions with inmates and would verbally abuse her. On one occasion, Frank locked Weaver out of the MHU and refused to open the gate to allow

---

[6] It is well settled that we may cite Superior Court cases for their persuasive value. *Commonwealth v. Monsanto Co.*, 269 A.3d 623, 653 n.20 (Pa. Cmwlth. 2021).

her access. (Weaver Dep. at 98-100; R.R. at 197a.) Due to Frank's persistence, Weaver felt pressured to meet him outside of work for a second sexual encounter. (Weaver Dep. at 111, R.R. at 200a.) When asked why she did not report this behavior to MHM, Weaver replied that "[Frank] did it in front of my coworkers. My coworkers were around when he was doing this. . . . Like [my coworker] was on the other side of the gate laughing at me." (Weaver Dep. at 100-01; R.R. at 197a-98a.) Weaver also testified that Frank told her he was friends with the superintendent and played golf with the deputies. (Weaver Dep. at 96, 108; R.R. at 196a, 199a.) Weaver testified Frank also told her that because he had been with DOC for a long time, if she filed a report against him, no one would believe her. (Weaver Dep. at 96; R.R. at 196a.)

Weaver testified she also feared retaliation if she were to report Frank's harassment to Dyke at Rockview, Kawtoski at MHM, or anyone else:

> Q. Did you tell [Kawtoski] about any other behavior by Officer Frank?
> A. No.
> Q. Did you tell [] Dyke about any other behavior by Officer Frank?
> A. No.
> Q. Why not?
> A. I had been warned by other CO's [sic] that by putting paperwork in, things were going to change, that I didn't want to make things worse than what they were already going to be for me.
> Q. Who were those CO's [sic] who told you that?
> A. I don't remember.
>
> . . . .
>
> I just said, like, [w]hat would you do if somebody was physically putting their hands on you?
> I didn't give them a name or anything, I just said theoretically what would you do.
> Q. Okay. And what did they say?
> A. I would put paperwork in on them, but be careful if you do.
> Q. Okay. What did they tell you could happen?

12

A. Retaliation, that things were going to change, that you are going to draw a line in the sand of whose side you're on.

(Weaver Dep. at 140-41, R.R. at 207a-08a.)

Because the trial court concluded DOC was not a joint employer of Weaver, it held Weaver's hostile work environment claim against DOC automatically failed. In finding no merit to Weaver's hostile work environment claim against MHM but referring to Frank as a "coworker," the trial court reasoned that "liability will be attributed to MHM only if it is apparent from the record that MHM failed to provide a reasonable avenue for complaint or should have known of the alleged harassment and failed to take prompt and appropriate remedial action." (Op. at 5). As the trial court explained:

In a claim for hostile work environment, liability for failure to take remedial action will only attach if the circumstances and conduct leading to the claim **are reported to management-level personnel for the employer.** On March 14, 2016, [Weaver] made a report to [] Dyke [] that Frank had grabbed her arm and twisted it behind her back, prompting the investigation by [] DOC. She then called and notified her MHM supervisor after leaving work that evening. [Weaver] states in deposition testimony, "I told her that I just put paperwork on Frank and the reason why and that I just was letting her know what was happening. . . [.] She said, "[t]hank you for telling me."[] [Weaver] did not go to work on March 15. When [Weaver] returned to work on March 16, she was notified that the security captain and lieutenant wanted to discuss the investigation with her. As previously noted, the captain and lieutenant indicated they had already interviewed Frank, another CO and an MHM nurse regarding [Weaver]'s claims, and they were told in response to their questions that [Weaver] was the first to initiate contact with Frank. Further, for purposes of the investigation, they asked [Weaver] "to write a written statement saying that specifically [she] *did not* put [her] hands on him first." [Weaver] complied. At some point during the conversation[,] she stated she needed to quit. The captain and lieutenant said it was 4:00 p[.]m[.] and they needed to leave, and that she also needed to go. [Weaver] gathered her belongings and left work. When she got home, she called her MHM supervisor and told her she had quit.

13

Without considering whether the conduct complained of [the arm-twisting incident] would be considered severe and pervasive for purposes of the [PHRA], which is questionable under relevant case law analysis, the inquiry regarding the alleged hostile work environment ends upon consideration of whether proper remedial action was taken. Because of the timeline of events and [Weaver]'s voluntary resignation, the [c]ourt is unable to ascertain whether the remedial action to be taken would have been reasonably calculated to put a stop to the alleged hostile working environment. Although [Weaver] notified her MHM supervisor on March 14, 2016, it was not until the evening following her work shift. Again, [Weaver] did not go to work on March 15th, 2016, and then quit at the beginning of her shift on March 16, 2016[,] during the pendency of the investigation. This clearly gave MHM little to no time to effectively remedy the alleged discrimination.

(Op. at 6-7 (footnotes omitted) (some brackets and italics in original) (bold emphasis added).)

Upon review, viewing Weaver's allegations in the light most favorable to her, as we must, and assuming DOC was Weaver's joint employer and Frank was her supervisor, we find that, at best, he was a low-level supervisor. Consistent with *Hoy*, the analysis is the same when the alleged harassment is carried out by a low-level supervisor as it is by a coworker. 691 A.2d at 480-81. In *Hoy*, trial testimony revealed that during the plaintiff's employment with Shop-Rite, "[harasser] subjected [the plaintiff] to various forms of abusive treatment, including sexual propositions, vile and filthy language, off-color jokes, physical groping, and the posting of sexually suggestive pictures." *Id*. at 479. The jury returned a verdict in favor of the plaintiff. *Id*. In requesting a judgment notwithstanding the verdict, the employer contended that the plaintiff had failed to establish the respondeat superior element of a hostile work environment claim because the harasser did not work as a supervisor for the employer, it had no knowledge, or any reason to know, of the sexually hostile work environment, and "effective remedial action" was taken. *Id*.

14

at 480. In concluding that the record lacked sufficient evidence to establish that the harasser was a supervisor and agent of the employer, the Superior Court reasoned as follows:

> Although [the harasser] was [the plaintiff's] immediate supervisor, he did not possess sufficient authority so as to classify him as [Shop-Rite]'s agent. His authority over [the plaintiff] and the other employees in the meat room was limited to scheduling their hours and insuring they kept the meat cases full. Moreover, [the harasser] did not purport to exercise [the employer]'s corporate authority as an instrument for harassment. Rather, the evidence indicates that [the harasser] was, at most, a low-level supervisor, more akin to a co-worker of [the plaintiff], and that his misconduct transpired due to his own reasons and was perpetrated by his own means. As such, any liability on the part of [the employer] cannot be predicated upon the status of [the harasser] as "chief journeyman" or "meat manager." . . .

*Id*. at 481.

Herein, Weaver does not dispute that Kelly Gallagher, MHM's director of nursing, and Kawtoski were the individuals to whom she reported directly, and who hired her and evaluated her job performance; Frank had no authority in this regard, nor did he have any control over her daily schedule or work assignments. While Frank may have had some influence over the manner in which Weaver could do her inmate charting or conduct group sessions, in light of *Hoy*, this authority falls far short of the requisite level needed to impute knowledge of his harassing behavior to DOC.

Thus, in order for DOC and/or MHM to be held liable for allowing Weaver to be subjected to a hostile work environment they must have known, or they should have known, of the harassment. Courts find that "an employer knew or should have known[,] about workplace sexual harassment if *management-level* employees had actual or constructive knowledge about the existence of a sexually hostile environment." *Huston*, 568 F.3d at 105 (citations and quotation marks omitted,

15

emphasis in original). Courts "also recognize[] that management level employees have constructive notice of a hostile work environment when an employee provides management level personnel with enough information to raise a probability of sexual harassment in the mind of a reasonable employer." *Id.* (citation and quotation marks omitted). In addition, Weaver must show that DOC's or MHM's action was not reasonably calculated to prevent further harassment. *See Knabe v. Boury Corp.*, 114 F.3d 407, 412 (3d Cir. 1997) ("[T]he law does not require that investigations into sexual harassment complaints be perfect. Rather, to determine whether the remedial action was adequate, we must consider whether the action was reasonably calculated to prevent further harassment."). If the remedy chosen by the employer is "adequate," an employee "cannot dictate that the employer select a certain remedial action." *Id.* at 414.

Viewing the foregoing deposition testimony in the light most favorable to Weaver, as we must, we conclude the trial court did not err in granting summary judgment in favor of Defendants on the hostile work environment charge. There is no evidence in the record to suggest that prior to her complaint to Shuss, a sergeant, about the arm-twisting incident involving Frank, she had previously reported **any** of the alleged sexual harassment to anyone at DOC or to MHM. The record does establish that both MHM and DOC had procedures in place through which Weaver could have pursued a complaint about workplace harassment. Section 1.B.1. of Policy 1.6.2 of DOC's Sexual Harassment Procedures Manual entitled "Procedures" provides multiple avenues through which an individual could lodge a complaint:

> Any employee, applicants for employment, visitors, contractors, and individuals or groups who have business with or use the resources of [DOC], who believes that he/she is the victim of sexual harassment should report immediately to his/her supervisor or someone in the

16

employee's direct line of supervision. If the concern involves the individual's direct supervisor or someone in the individual's direct line of supervision, or if the individual is uncomfortable for any reason discussing such matters with the supervisor and/or others in the direct line of supervision, or is not satisfied after reporting information to such individuals, the employee may take his/her concerns to the facility's Field Human Resource Officer (FHRO) or Facility Manager at the facility where the alleged act of discrimination occurred, or [DOC]'s Office of Equal Employment Opportunity (EEO). [DOC]'s Office of EEO toll-free reporting line is 1-877[-] EEO-8046.

(R.R. at 882a (emphasis omitted).) In addition, Section II of MHM's "Employee Handbook & Code of Business Conduct" (Employee Handbook) contains a heading entitled "Workplace Harassment and Mutual Respect." Therein, workplace harassment and sexual harassment are defined and instructions are provided to potential victims as to how to proceed. It specifically states:

If you think another employee, client, visitor, vendor or any other business contact is harassing you in violation of this policy, ask that person to stop immediately. If they continue to violate the policy, contact your Supervisor or your [human resources] Business partner. ...

This policy applies at all MHM offices and work locations and also to MHM-sponsored events, offsite meetings, business travel, and any other offsite locations where employees perform work for MHM.

(Employee Handbook at 4; R.R. at 1068a-1070a.) Weaver digitally executed the acknowledgement of receipt of the Employee Handbook on March 30, 2015. (R.R. at 1071a.)

Although Weaver testified she believed any attempt to report Frank's behavior to DOC officials would have been unsuccessful, this belief does not obviate the need for her to have taken steps to resolve her concerns by informing her supervisors at MHM of the harassment. *See Huston*; *Knabe*. The sexual harassment policies in place at both DOC and MHM gave Weaver clear direction as to how to

17

do so. Nevertheless, by her own admission, Weaver did not follow these procedures to inform anyone at MHM or DOC of her concerns about Frank's sexually-based harassment toward her, or other pervasively hostile behavior, prior to March 2016, when she reported only the arm-twisting incident. (Weaver Dep. at 72, 96, 100, 103-04, 107-09, 112, 133, 136-40, 231, 269, 271; R.R. at 190a, 196a-99a, 200a, 206a-07a, 230a, 240a). In fact, Weaver's written statement completed on March 16, 2016, **the day she resigned**, did not set forth any allegations of slurs, abuse, consistent groping, or other forms of sexual assault. (R.R. at 1089a-99a; 1100a-21a.) Similarly, in her March 20, 2016, letter of resignation, Weaver again referenced only her "report against workplace violence" and failed to mention any sexually harassing behavior by Frank or anyone else. (R.R. at 294a.) Also, only the arm-twisting incident is referenced in the document entitled "WORKPLACE VIOLENCE-INVESTIGATIVE SUMMARY" (Summary) dated March 31, 2016. (R.R. at 620a-28a.) The Summary indicates that the "investigation was predicated on an allegation of workplace violence submitted on March 14, 2016[,] by MHU worker, [] Weaver." (R.R. at 620a.)

Upon learning of this single incident, both entities promptly initiated an investigation. Kawtoski testified that it was not until two days before Weaver resigned from MHM that Weaver informed Kawtoski a CO had grabbed her by the arm and she "felt like a victim." (Kawtoski Dep. at 48-50; R.R. at 487a-488a.) Upon learning of Weaver's report of the arm-twisting incident, Kawtoski immediately began an investigation and notified Chuck Whitney (Whitney), MHM's then-Senior Human Resources Business Partner for MHM at Rockview, who told her he would begin his own investigation. Dyke also initiated an investigation at Rockview, and after Weaver's resignation from MHM, DOC's investigation continued, and

18

Whitney assisted. (R.R. 1090a-98a, 1158a-1159a, 1165a). Weaver admitted that Kawtoski took immediate action by pronouncing on March 16, 2016, that MHM staff was no longer allowed access to the security office in the MHU. (Weaver Dep. at 164-65, R.R. 213a-214a.) Simply put, with the exception of the arm-twisting incident, Weaver made no mention to anyone at either DOC or MHM that Frank was harassing her. Frank was ultimately reprimanded as part of the resolution. Therefore, no liability attached under the PHRA. *See Huston*; *Knabe*.

## B. Constructive Discharge

### 1. Parties' Arguments

Weaver next posits there is a genuine issue of material fact as to her constructive discharge claim due to the pervasively hostile work environment in which she worked. Weaver testified that upon her return to work after reporting that Frank had twisted her arm behind her back, she was "ostracized" by her coworkers when she arrived for shift review with the nursing staff in the MHU. (Weaver's Br. at 57 (citing R.R. 206a, 208a-09a).) Thereafter, Weaver was directed to report to the security building at which time the security captain accused her of "putting hands on Frank first" on the day of the arm-twisting incident. (*Id*. at 58 (citing R.R. 209a).) Weaver added that on March 16, 2016, three days after she first reported that Frank pulled her arm behind her back, she was told by security officers that because they were leaving at 4:00 p.m., she, too, had to leave and would no longer be allowed in the facility because she was the problem. (*Id.* at 59-60.)

DOC argues because Weaver was not a DOC employee, she cannot establish a claim for constructive discharge against it but, nevertheless, such a claim would fail. DOC states that the record belies Weaver's deposition testimony pertaining to

19

its lack of remedial action and retaliatory behavior. According to DOC, the ultimate conclusion of the investigation, which found Frank had violated DOC policies, is contrary to Weaver's assertion that the investigators shifted blame from Frank to her. Moreover, Weaver resigned before DOC could make a final determination. (DOC's Br. at 34-36.)

For similar reasons, MHM asserts Weaver failed to establish a prima facie case for constructive discharge. MHM states that the only incident about which Weaver testified involving MHM occurred when she arrived for her evening shift on March 16, 2016, and no one offered her a seat during the shift review, as was customary, and when she asked Kawtoski if she had "heard anything" about the complaint she said "no" and quickly left with the others. (MHM's Br. at 41 (citing R.R. at 208a-09a).) Thereafter, Weaver was instructed to report to DOC investigators, and when she returned from providing her written statement, she gathered her belongings and left. MHM points out that Weaver testified she never discussed the problems she had been having with Frank during any of her three performance interviews and knew that MHM had an Employee Handbook, harassment and discrimination policies, and a human resource department; therefore, MHM could not have knowingly allowed Frank's behavior to occur without taking remedial action. (*Id*. at 42-43.)

### 2. *Analysis*

In *Kegerise v. Delgrande*, 183 A.3d 997, 1004 n.10 (Pa. 2018), the Pennsylvania Supreme Court clarified that an action for constructive discharge is distinguishable from a hostile work environment claim and set forth the necessary elements to establish constructive discharge as follows:

> A . . . constructive discharge claim entails something more [than allegations of an abusive working environment]: A plaintiff who

20

advances such a compound claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign. *See, e.g.*, *Breeding v. Arthur J. Gallagher & Co.*, 164 F.3d 1151, 1160 (8th Cir. 1999) ("[A]lthough there may be evidence from which a jury could find sexual harassment, . . . the facts alleged [for constructive discharge must be] . . . so intolerable that a reasonable person would be forced to quit."); *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1015 (7th Cir. 1997) ("[U]nless conditions are beyond 'ordinary' discrimination, a complaining employee is expected to remain on the job while seeking redress.").

(ellipsis and brackets in original) (citing *Pa. State Police v. Suders*, 542 U.S. 129 (2004)). "Constructive discharge occurs only when an employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." *Raya & Haig Hair Salon v. Pa. Hum. Rels. Comm'n*, 915 A.2d 728, 733 (Pa. Cmwlth. 2007) (citation and internal quotation marks omitted).

The trial court's discussion on this claim herein was as follows:

[T]o succeed on a constructive discharge claim, *the employer* must have made working conditions so intolerable that an employee has been forced to resign.[] Constructive discharge is assessed by an objective standard. "It may not be premised upon the conclusion that resignation was the wisest or best decision under the circumstances, nor is it established based on an employee's subjective judgment." For example, constructive discharge was found in *Helpin v. Trustees of University of Pennsylvania*, [969 A.2d 601 (Pa. Super. 2009),] where a university doctor's salary was sharply cut by two-thirds, his office was taken away, he was no longer permitted to see patients in clinic, [was] denied reimbursement, was not supplied with a computer, [was] accused of budgetary impropriety and issued a disciplinary letter from the new dean. Our Superior Court agreed that a reasonable person in this employee's position would feel they had no choice but to resign.

Based upon the analysis regarding [Weaver]'s hostile work environment claim and her lack of any substantiating evidence aside from deposition testimony vaguely asserting lack of remedial action and retaliatory behavior, [Weaver] has failed to establish a prima facie

21

case for constructive discharge.

(Op. at 7 (emphasis in original; footnote omitted).) Following our review of the record, we discern no error in this conclusion.

Weaver testified that she first reported Frank's twisting of her arm to Shuss whom she described as a "sergeant that [she] kind of knew[,]" through Facebook Messenger; however, Weaver asked Shuss not to tell anyone else either verbally or by filing a written report. (Weaver Dep. at 127-28; R.R. at 204a.) Shuss advised Weaver to report Frank's behavior to her supervisor. (Weaver Dep. at 129; R.R. at 205a.) Weaver did not inform Shuss of any other harassing behavior involving Frank. (Weaver Dep. at 128; R.R. at 204a.) Weaver stated that she thereafter also verbally told two charge nurses, Kawtoski, and Dyke, the captain on the night shift at Rockview, about the arm-twisting incident. (Weaver Dep. at 130-34, R.R. at 205a-206a.) Dyke instructed Weaver to write a report pertaining to the arm-twisting incident on March 14, 2016. (Weaver Dep. at 135-36; R.R. at 206a.) In that report, dated March 14, 2016, Weaver indicated that she had contacted Shuss outside of work on March 11, 2016, and told him Frank had twisted her arm behind her back. Later, Shuss told Weaver that he spoke with Frank at which time Frank admitted to Shuss "he put his hands on [her]." (Weaver Dep. at 137, R.R. at 207a.)

As discussed above on March 15, 2016, her scheduled day off, Weaver called Kawtoski to ask if she had heard anything about Weaver's complaint, but Kawtoski had no update for her. When Weaver arrived for work the next day on March 16, 2016, she testified that she was "definitely ostracized as soon as [she] entered the office." (Weaver Dep. at 144; R.R. at 208a.) Weaver explained that when she reported for shift review, she was not offered a seat, as is customary. When she again asked Kawtoski for update on her complaint, Kawtoski said she had none and,

22

along with the others, "quickly left" and "[n]o one would really talk to [Weaver]." (Weaver Dep. at 145, R.R. at 209a.)

Shortly after her shift began, Weaver was told that the security captain and lieutenant wished to speak to her, and she proceeded to walk to the security building where she met with DOC personnel. (Weaver Dep. at 146; R.R. at 209a.) It was at this point that Weaver claimed she was accused of "put[ting] [her] hands on [Frank] first," and "asked [] to write a written statement saying that specifically [she] did not put [her] hands on him first." (Weaver Dep. at 146-47; R.R. at 209a.) Weaver did so and indicated therein that Frank yelled at her, "grabbed [her] arm, so in response [she] dug [her] nails into [his] arm. . . . He then grabbed [her] arm and twisted it and bent it behind [her] back. . . . Contact was initiated by [] Frank. [She] did not touch him first." (See Weaver's Witness Statement; R.R. at 293a.)

Weaver stated she began to "cry a lot[,]" and said that she "didn't feel safe anymore, that [she] needed to quit." (Weaver Dep. at 147; R.R. at 209a.) When asked what happened next, Weaver explained:

A. They said it's four o'clock. We're leaving. We've got to go. You've got to leave.
Q. And what did you do from there?
A. They walked me out, like, out of the security building there.
Q. Okay. And where did you go?
A. Back to the MHU.
Q. Okay. And what happened?
A. No one would talk to me. I was still crying. I started to pack up my things. And I was saying good[]bye to the one psychologist there when [an MHM employee] came in and said, you know, pretty much that this is my fault, that why would I do this, and that if I'm going to leave then I need to leave.

(Weaver Dep. at 149-150; R.R. at 210a.) Although it was the beginning of her shift, Weaver proceeded to leave the prison. (Weaver Dep. at 150-51; R.R. at 210a.)

When she arrived at home, Weaver called Kawtoski to inform her that she had quit and taken all of her belongings, and Kawtoski responded "I understand." (Weaver Dep. at 152; R.R. at 210a.) On March 20, 2016, Weaver submitted a formal letter to Whitney at MHM resigning her position wherein she referenced only the arm-twisting incident and made no mention of any sexual harassment. (Weaver Dep. at 153-56; R.R. at 211a.)

By her own admission, and as evidenced in the record, at no time on March 16, 2016, or beforehand, did Weaver advise anyone of the alleged sexual misconduct to which Frank had subjected her. Thus, she cannot establish that MHM knowingly permitted her to work in an intolerable condition as a result. *Raya,* 915 A.2d at 733. Instead, Weaver bases her constructive discharge claim on her feelings of being ignored by her MHM colleagues during shift review and on being told to leave following the security interview on March 16, 2016, the day she resigned. (Weaver's Br. at 57-58.) However, while Weaver may have found this treatment hurtful, this behavior was not so severe or pervasive to have created a hostile work environment that would lead a reasonable person to resign the same day upon which it occurred. *Kegerise*, 183 A.3d at 1004. This is especially so in light of the fact that Weaver knew her complaint against Frank was under investigation. *Id.* Thus, we find no error in the trial court's determination that Weaver's constructive discharge claim fails as a matter of law.

## C. **Unlawful Retaliation**

### 1. *Parties' Arguments*

Lastly, Weaver argues that she could satisfy the three elements necessary to prove a claim of retaliation, namely, (i) that she engaged in a protected activity, (ii) Defendants took an adverse employment action after that protected activity, and (iii)

24

there is a causal link between the protected activity and the adverse action. (Weaver's Br. at 60 citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 (3d Cir. 2000).) Weaver alleges that the protected activity in which she engaged was the filing of a formal complaint against Frank regarding the arm-twisting incident and that she was forced to resign only three days after she reported Frank's behavior, which suggests a retaliatory motive. (*Id.*)

DOC posits that Weaver's claim for retaliation fails, because even assuming her Complaint constituted a protected activity under the PHRA, she cannot establish an adverse employment action because the DOC "did not, because it could not, fire her, suspend her, demote her, reprimand her, or change any conditions of her employment." (DOC's Br. at 36-37.) DOC states that the only retaliation of which she spoke in her deposition was that she "did not like the tone of the investigators when they questioned her." (DOC's Br. at 37.) DOC stresses that it took prompt action to investigate Weaver's March 14, 2016 Complaint, but Weaver quit in the middle of the investigation. (*Id.*)

MHM argues it did not fire or discipline Weaver, and the only retaliatory behavior that she vaguely claimed led to her resignation was the fact that none of her coworkers would speak with her at the shift turnover meeting on March 16, 2016, about an hour before she quit. (MHM's Br. at 43-44.)

2. *Analysis*

The PHRA prohibits retaliation and forbids an employer from "discriminat[ing] in any manner against any individual because such individual has opposed any practice forbidden by this act, or because such individual has made a charge, testified or assisted, in any manner, in any investigation, proceeding or

25

hearing under this act." 43 P.S. § 955(d). This Court has stated that a prima facie case of retaliation under the PHRA requires proof that a complainant:

> (i) [] was engaged in a protected activity; (ii) her employer was aware of the protected activity; (iii) subsequent to participation in the protected activity complainant was subjected to an adverse employment action; and (iv) there is a causal connection between participation in the protected activity and the adverse employment action.

*Spanish Council of York, Inc. v. Pa. Hum. Rels. Comm'n*, 879 A.2d 391, 399 (Pa. Cmwlth. 2005) (citation omitted). "For purposes of the first prong of a prima facie case of retaliation, protected opposition activity includes not only an employee's filing of formal charges of discrimination against an employer but also informal protests of discriminatory employment practices, including making complaints to management." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015) (citation and internal quotation marks omitted). In addition, the protected activity must involve employment discrimination forbidden by the statute, such as implicating one's sex. *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 792 n. 10 (3d Cir. 2016). Although Weaver does not need to prove the merits of her underlying discrimination Complaint in her retaliation case, she must present evidence that she acted in good faith with an objectively reasonable belief that Frank's behavior toward her constituted unlawful discrimination under the PHRA. *Daniels*, 776 F.3d at 193-94.

In disposing of this claim, the trial court found that "[Weaver] cannot point to any adverse action taken by employer MHM. Based upon the same reasoning outline[d] herein, [ ] [Weaver's] claim for retaliation must fail." (Op. at 7.) Our review of the record finds support for this conclusion.

26

When she was asked to specify how she was harassed, discriminated, and retaliated against for lodging a complaint against Frank, Weaver stated the following:

> Q. Okay. How were you harassed? And I want to be specific. How were you harassed for making a report about [] Frank?
> A. **The fact that I was the one being interrogated by the security officers, making it seem like it was my fault**.
>
> . . . .
>
> Q. Okay. How else were you harassed as a result of making a report against Officer Frank?
> A. That was it.
> Q. How were you discriminated against for making a report against Officer Frank?
> A. I wasn't allowed in any of the CO offices anymore.
> Q. Who told you that?
> A. [Kawtoski].
> Q. When did she tell you that?
> A. When I got there that day, my last day.
> Q. That's the 16th?
> A. Yes.
> Q. Okay. What did she tell you?
> A. **She said that no one was allowed** but that it was- but I had heard it was from me, that it was because of me and that I specifically was not allowed in CO offices.
> Q. Okay. **Did she say, you know, [Weaver] you can't personally go in the office, or did she say, [n]obody is allowed in the office**?
> A. **Nobody**.
> Q. Ok. Did she say why?
> A. No.

(Weaver Dep. at 164-65; R.R. at 213a-14a (emphasis added).) Weaver further testified:

> Q. . . . **What retaliation** did you experience from the MHM employees?
> A. The **fact that no one talked to me**.

27

Q. And that was after you reported . . . the incident . . . on March 14th?
A. Yes.
Q. . . . And then the behavior of the MHM employees when you came back to work on March 16?
A. Yes.
Q. **Is that the only retaliation that you experienced from MHM employees**?
A. **Yes**.

(Weaver Dep. at 293-94; R.R. at 246a (emphasis added).)

Both DOC and MHM were aware that Weaver had filed a written report against Frank; therefore, she has satisfied the first two prongs of a prima facie case of retaliation. *Spanish Council*, 789 A.2d at 399. However, Weaver cannot show that as a result of filing her Complaint, she was subjected to an adverse employment action. To the contrary, Kawtoski described Weaver as a "good employee" who did "excellent work with the patients [and] facilitated good groups." (Kawtoski Dep. at 46; R.R. at 487a.) After Weaver filed her Complaint, Kawtoski initiated an investigation the next day, pursuant to which she spoke to 20-25 individuals. (Kawtoski Dep. at 51-55; R.R. at 488a-89a.) Kawtoski also notified Whitney who told her he would begin his own investigation into Weaver's Complaint. (Kawtoski Dep. at 53-56; R.R. at 489a.) Although she was not aware of any policies pertaining to when MHM employees are to provide written statements to DOC personnel, Kawtoski directed Weaver to "go to security to report anything she felt was wrong[.]" (Kawtoski Dep. at 64, 71; R.R. at 491a, 493a.) Kawtoski immediately put a policy in place to keep all MHM personnel from the CO offices, a place where **they were not authorized to be anyway**. (Kawtoski Dep. at 62-63, 164-65; R.R. 188a, 213a-14a.) DOC officials met with Weaver at the beginning of her shift on March 16, 2016, her first workday after she filed the Complaint, to obtain additional information from her regarding Frank's behavior and asked her to issue a written statement, and an investigation ensued. In fact, Whitney continued to cooperate with

28

DOC's investigation after Weaver resigned from MHM.  (R.R. 1158a-59a, 1165a-67a.)

As the foregoing record evidence shows, neither DOC nor MHM fired, suspended, or took any other form of adverse action against Weaver when it learned of her Complaint regarding Frank's alleged behavior.  Contrarily, MHM worked with Weaver and DOC personnel to reach a resolution.  Viewing the foregoing in a light most favorable to Weaver, as we must, we do not find that Weaver has produced enough to create a genuine dispute of material fact regarding her prima facie case for retaliation.  Thus, this final claim fails as a matter of law.

## III.    CONCLUSION

Viewing the evidence in the light most favorable to Weaver, the nonmoving party, we conclude that Weaver has not put forth substantial evidence to satisfy the requirements of a hostile work environment, constructive discharge, and unlawful retaliation claim.  Because our analysis has not uncovered the existence of genuine issues of material of fact that remain to be decided in this case, the trial court's grant of summary judgment in favor of DOC and MHM was proper.  The trial court's order is affirmed.[7]

**RENÉE COHN JUBELIRER,** President Judge

---

[7] We may affirm the trial court's holding on any basis that is clear on the record.  *Public Advocate and Consumers Educ. and Protective Ass'n v. City of Philadelphia*, 662 A.2d 686, 687 n. 2 (Pa. Cmwlth. 1995).

29

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Emily Weaver,                        :
                  Appellant        :
                                  :
            v.                     :   No. 612 C.D. 2021
                                  :
MHM Correctional Services, Inc.   :
and Commonwealth of Pennsylvania,  :
Department of Corrections          :

## O R D E R

NOW, September 22, 2023, the Order of the Court of Common Pleas of Centre County in the above-captioned matter, is AFFIRMED.

_____
**RENÉE COHN JUBELIRER,** President Judge